### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Case No. 14-05349 |
| OHCMC-OSWEGO, LLC, | ) Chapter 11 |
| | ) |
| Debtor. | ) Hon. Carol A. Doyle |
| | ) |
| | ) |

**ORDER GRANTING MOTION FOR ENTRY OF AN ORDER (A) ESTABLISHING
BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF THE
DEBTOR'S ASSETS UNDER A PLAN OF LIQUIDATION; (B) APPROVING
FORM OF ASSET PURCHASE AGREEMENT; (C) APPROVING
BREAK-UP FEE; AND (D) GRANTING RELATED RELIEF**

Upon the motion (the *Motion*")[1] of OHCMC-Oswego, LLC (the "*Debtor*") filed in the

above-captioned chapter 11 case seeking entry of an order (Docket No. 71, the "*Sale Procedures*

*Order*"): (a) establishing bidding procedures in connection with the Debtor's proposed plan of

liquidation, pursuant to which the Debtor will seek approval of a sale of substantially all of the

Debtor's assets (the "*Assets*") as defined in the Stalking Horse APA, to L.B. Anderson

Construction, Inc., (the "*Stalking Horse*"), or to such other entity that may submit the highest or

otherwise best Qualified Bid for the Assets; (b) approving the form of the Stalking Horse APA;

(c) approving the payment of a break-up fee (the "*Break-Up Fee*") in favor of the Stalking Horse

upon the terms and conditions set forth in the Stalking Horse APA; and (d) granting related

relief; it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper in this

District pursuant to 28 U.S.C. §§ 1408 and 1409; and due, adequate, and sufficient notice of the

---

[1]       Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

Motion having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause appearing therefore; it is

**ORDERED, ADJUDGED AND DECREED** that:

1.      The Motion is granted as set forth herein and in the attached Sale Procedures.

2.      All objections to the entry of this Order not settled, withdrawn, or otherwise resolved are overruled.

3.      The Sale Procedures attached to this Order as Exhibit A are hereby approved.

4.      The Stalking Horse APA is hereby approved.

5.      The Break-Up Fee is hereby approved.

6.      Either or both of BMO and PNC, or neither, may credit bid for the Assets upon which they hold valid and perfected liens and security interests, as provided in the Sales Procedures, and the Debtor will not object to any such credit bid(s).

7.      If (i) the Stalking Horse APA is terminated, and the Debtor does not receive any Qualified Bids on or before September 30, 2014; or (ii) the Winning Bidder (including, without limitation, a Back-Up Bidder in the event the initial Winning Bidder fails to close) fails to timely close in accordance with their respective APA, and the Debtor has not set for hearing a request to extend the time to close under said APA within fourteen (14) days of the deadline to timely close under said APA, then:

(a) BMO and PNC are hereby granted relief from the automatic stay to pursue their rights and remedies against the Debtor and its assets without further Order of the Court, in the event they choose not to exercise their credit bid rights pursuant to Sale Procedures. The fourteen day stay imposed pursuant to Bankruptcy Rule

4001(a)(3) is waived in the event the automatic stay is lifted under the terms of this paragraph.

(b) To the extent that either or both of BMO and PNC credit bid for the Assets, and one or both is the successful bidder for the Debtor's assets against which it has valid and perfected liens and security interests, such successful bid(s) will be submitted to the Court for approval. If only one of BMO and PNC, or neither, credit bid for the Assets, then the lender(s) which has not made a credit bid shall be entitled to the relief from the automatic stay set forth in paragraph 7(a) of this Order without further order of the Court.

8. The Debtor's proposed plan of liquidation (Docket No. 46, the "*Plan*"), and any order presented to the Court for confirmation of the Plan, shall include provisions which are compatible with paragraph 7 of this Order regarding relief from the automatic stay in favor of PNC and BMO.

9. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: June 17 , 2014

_____
UNITED STATES BANKRUPTCY JUDGE

3

# EXHIBIT A

*In re OHCMC-Oswego, LLC,*
**Case No. 14 – 05349 (Bankr. N.D. Ill.)**

## SALE PROCEDURES

The following procedures shall apply to the Sale[1] of the Debtor's Assets:

**A.     Requirements for Participation in Auction; Qualified Bidders:**

     1. For the purposes of these Sale Procedures, a "Qualified Bidder" is one who submits a "Qualified Bid." Only Qualified Bidders (as defined below) may participate at the Auction (as defined below).

     2. A "Qualified Bid" is an offer to purchase the Assets that adheres to the requirements set forth below; no offer may be a Qualified Bid unless it complies with all such requirements in full, unless otherwise waived by the Debtor.

    i.    <u>Deadline for Submitting Qualified Bids</u>: An entity that wishes to submit a Qualified Bid must submit its bid so that it is actually received on or before 4:00 p.m. Central Time on September 12, 2014 (the "*Qualified Bid Deadline*").

    ii.    <u>Where to Submit Bids</u>: Proposed Qualified Bids must be submitted via electronic mail or facsimile transmission and must include an electronic mail address at which the entity submitting the same may be contacted:

<u>Counsel for the Debtor:</u>

Richard S. Lauter
Devon J. Eggert
FREEBORN & PETERS LLP
311 South Wacker Drive, Ste. 3000
Chicago, Illinois 60606-6677
Telephone:  312.360.6000
Facsimile:  312.360.6520
rlauter@freeborn.com
deggert@freeborn.com

---

[1]    All capitalized terms not defined herein shall have the meaning ascribed to them in the Debtor's Plan of Liquidation Dated May 7, 2014.

with a copy to:

James Angelotti
CBRE, Inc.
700 Commerce Drive, Ste. 550
Oak Brook, Illinois 60523
Telephone: 630.573.7093
Facsimile: 630.573.7018
james.angelotti@cbre.com

Counsel for BMO

David T.B. Audley
Michael T. Benz
Chapman and Cutler LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
Facsimile: (312) 516-3969
benz@chapman.com

Counsel for PNC

James M. Crowley
Frances J. Pendergast
Crowley & Lamb, P.C.
221 N. LaSalle Street
Chicago, Illinois 60601
Telephone: (312) 670-6900
Facsimile: (312) 467-5926
jcrowley@crowleylamb.com

iii.  Content of Qualified Bid:  All Qualified Bids:

(a)  must be in writing;

(b)  must be for at least one of the property index numbers (each a "*PIN*") of the Debtor's Assets;[2]

(c)  must propose a purchase price for the Assets that provides cash at closing, in immediately available funds, in a sum of not less than

---

[2]  If a party submits a bid for multiple PINs, the bidder may, but is not required to, allocate the portion of the purchase price that is attributable to each PIN.  In the event a party submits a bid for more than one PIN and does not allocate the purchase price among each PIN, the Debtor will allocate the purchase price evenly among the PINs subject to the bid.

2

$12,150,000, plus certain cure amounts and assumed liabilities, if any;

(d)    must include an executed asset purchase agreement, in the form of the asset purchase agreement (the "*APA*") attached hereto as Exhibit 1, containing substantially all the terms and conditions contained in the APA, with the exception of the requirement of an increased purchase price and a break-up fee. A proposed Qualified Bid may not include any provisions for a break-up fee, expense reimbursement, or similar payment. A proposed Qualified Bid must also include a redlined or blacklined version of the APA, showing all changes made to the APA by the party submitting the bid;

(e)    must fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with the proposed Qualified Bid and the complete terms of any such participation, including as to any source of financing;

(f)    must be irrevocable until the earlier of (x) the closing of a sale of the Assets and (y) sixty (60) days after the order approving the Debtor's Plan becomes a final non-appealable order;

(g)    must state that the proposed Qualified Bidder agrees, if chosen as such, to be the Back-Up Bidder for the Assets for which it has bid and to close on such Back-Up Bid at the highest offer it made at the Auction;

(h)    must not be contingent upon any conditions other than those specified in the APA. Under no circumstances may the proposed Qualified Bid contain any financing or due diligence contingencies and any financing commitment letter submitted therewith must be unconditional except for customary and standard documented conditions acceptable to the Debtor;

(i)    must (x) represent that the proposed Qualified Bidder is financially capable of consummating its proposed transaction and (y) include information sufficient to establish to the satisfaction of the Debtor that the proposed Qualified Bidder is capable of doing so, which information shall include detail regarding the source(s) of funds that will be used to consummate the transaction and may, in addition, include bank statements, current financial statements, or other proof of available liquid assets or available financing sufficient to consummate the transactions proposed in the bid;

3

(j)    must (x) identify any executory contracts and/or unexpired leases of the Debtor that the proposed Qualified Bidder wishes to have assumed by the Debtor and assigned to it; and (y) provide evidence establishing such proposed Qualified Bidder's ability to provide adequate assurance of future performance (within the meaning of section 365(b) of the Bankruptcy Code) under any executory contracts or unexpired leases such proposed Qualified Bidder proposes to have assigned to it;

(k)    must contain written evidence that the proposed Qualified Bidder has obtained all necessary corporate, limited liability company, or similar authority including all internal consents, necessary for it to close and fund the proposed transaction; and

(l)    must be accompanied by an all-cash deposit (the *"Deposit"*) equal to 5% of the proposed purchase price.

### B.    <u>Designation of Qualified Bids</u>:

1. Not later than September 15, 2014, the Debtor shall designate those submitted bids, if any, that are Qualified Bids; provided, however, that the Debtor may determine at the Auction, that a previously Qualified Bidder has altered its bid in a way that causes it no longer to be a Qualified Bidder absent the provision of further assurances (*e.g.,* due to an increase in the proposed purchase price that is not supported by the previously submitted proof of financial resources; additional closing conditions, etc.).

2. Not later than September 15, 2014, the Debtor shall notify each entity that has submitted a Qualified Bid, by electronic mail only, that its bid has been designated as a Qualified Bid.

3. The Stalking Horse, BMO and PNC shall be considered Qualified Bidders. BMO and PNC may credit bid the amount of their respective indebtedness, but only as to the Assets for which the lender holds a valid and perfected security interest. In the event that either or both BMO and PNC submit such credit bids and one or both is the successful bidder for the Assets, a hearing for approval of the sale to either or both BMO and PNC shall occur on September 17, 2014 at 10:30 a.m.

### C.    <u>Auction</u>:

1. If one or more Qualified Bids (other than the Stalking Horse bid) are received for the Assets, an Auction will be conducted at the offices of Freeborn & Peters LLP, 311 S. Wacker Drive, Suite 3000, Chicago, IL 60606, on September 16, 2014, commencing at 10:00 a.m. Central Time.

4

2.   Attendance at the Auction shall be limited to representatives of the Debtor (including its real estate broker), BMO, PNC, Qualified Bidders, the U.S. Trustee, and such other parties as the Debtor may authorize in its sole discretion.

3.   All bids submitted at the Auction shall be in increments of no less than $50,000.

4.   The Debtor, in its sole discretion, may announce at the Auction additional rules for bidding and other procedures for conducting the Auction.

5.   The Debtor shall, in consultation with BMO and PNC, select the Qualified Bidder with the highest and best offer as the winning bidder (the "*Winning Bidder*") at the conclusion of the Auction.  In the event the Winning Bidder fails to close on the Sale of the Assets, the Qualified Bidder that submitted the next highest Qualified Bid shall be designated the Winning Bidder and shall be required to close the Sale of the Assets under the terms set forth in such Qualified Bidder's APA.  Within twenty (20) days after the closing of a sale to the ultimate purchaser of the Assets, the Debtor shall return or cause to be returned the Deposit to all Qualified Bidders which were not the ultimate purchaser of the assets, provided, however, that if a Qualified Bidder was declared the Winning Bidder and failed to consummate a purchase of the Assets because of a breach or failure to perform on the part of such Winning Bidder, and the Debtor is not then deemed to be in material breach of the applicable purchase and sale agreement, then the Debtor will not have any obligation to return the Deposit of such Qualified Bidder, and such Deposit shall irrevocably become the property of the Debtor.

D.   **Payment of the Break-Up Fee**:  In the event the Stalking Horse does not breach the terms of the Stalking Horse APA and is not the ultimate purchaser of the Assets, the Break-Up Fee shall be payable at the time of closing of the Sale of the Assets.

E.   **Executory Contracts and Unexpired Leases**:  Pursuant to the Sale Procedures, the Debtor shall be required to file a separate motion or motions, seeking authority, under section 365 of the Bankruptcy Code, to assume and assign executory contracts and unexpired leases to the Winning Bidder, and will ask that the Court fix the amounts that must be paid under section 365(b) of the Bankruptcy Code in connection with such assumption and assignment.

F.   **Discretion of the Debtor Regarding Sale of Assets**:  The Debtor may reject any bid that it deems inadequate or insufficient or that is not in compliance with the Sale Procedures, the Plan or the Bankruptcy Code.  Further, the Debtor may extend or modify any of the deadlines set forth herein with the consent of BMO and PNC.

5

# EXHIBIT 1

## AGREEMENT FOR THE PURCHASE AND SALE

THIS AGREEMENT FOR THE PURCHASE AND SALE (this "Agreement") is entered into as of _____ __, 2014 ("Effective Date") by and between OHCMC - Oswego, LLC an Illinois limited liability company ("Seller"), which is currently a debtor-in-possession in a proceeding under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") pending in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"), and _____, a(n) _____ ("Purchaser").

SECTION 1    SALE OF PROPERTY.

Subject to the terms and conditions provided in this Agreement, Seller agrees to sell and Purchaser agrees to purchase all of Seller's right, title and interest in and to the following described property:

The land legally described on <u>Exhibit A</u> attached hereto and made a part hereof and consisting of approximately 487.66 acres in the Hummel Trails South subdivision in Oswego, Kendall County, Illinois (the "Real Estate"), together with all right, title and interest of Seller in and to all privileges, rights, easements, improvements, hereditaments, and appurtenances belonging to the land, and all right, title and interest of Seller in and to any streets, alleys, passages and other rights-of-way included therein or adjacent thereto, and any and all improvements thereon (collectively, the "Property").

SECTION 2    PURCHASE PRICE.

The purchase price to be paid by Purchaser to Seller for the Property is _____ No/100 Dollars ($_____) (the "Purchase Price"). The Purchase Price will be paid by Purchaser at Closing (as defined in Section 4.1 below) subject to the terms herein.

2.1    <u>Bid Deposit</u>.  Purchaser and Seller acknowledge that prior to the Effective Date Purchaser delivered to Seller a bid deposit equal to five percent (5%) of the Purchase Price, or _____ and No/100 Dollars ($_____) ("Bid Deposit").  The Bid Deposit shall be applied to the Purchase Price at Closing and is non-refundable to Purchaser unless this Agreement is terminated due to a condemnation event in accordance with the terms and conditions set forth in Section 8 hereof, or due to a default by Seller in accordance with the terms and conditions set forth in Section 9 hereof.

2.2    <u>Funds at Closing</u>.  At Closing, Purchaser shall pay to Seller the balance of the Purchase Price, subject to prorations as herein provided, by a wire transfer in immediate same day funds.

SECTION 3    DUE DILIGENCE.

Purchaser acknowledges and agrees that (a) prior to the Effective Date Purchaser conducted its own due diligence investigations of the Property and related materials, including, without limitation, environmental, title and survey matters, (b) Purchaser is satisfied with the results of such due diligence activities, and (c) Purchaser is not entitled to any further access to the Property or to materials in Seller's possession or control concerning the Property.

SECTION 4   CLOSING.

4.1   Closing Date.   The closing of the purchase and sale of the Property (the "Closing") shall take place on the date that is no more than thirty (30) days following the Effective Date. Purchaser and Seller will work together to determine a mutually acceptable closing date within such timeframe ("Closing Date"). The Closing shall occur at the office of the Chicago Title Insurance Company (the "Title Company") designated by Seller.

4.2   Purchaser's Obligations at Closing.   In addition to delivery of the balance of the Purchase Price as described in Section 2.2, Purchaser shall execute and deliver the following to Seller at Closing:

(a)   Closing statement;

(b)   Counterpart signature pages to all applicable transfer tax declarations;

(c)   Counterpart signature pages to any Assignment and Assumption Agreements (as defined in Section 7 hereof).

(d)   Such other documents as may be necessary or desirable to consummate the purchase and sale contemplated in this Agreement.

4.3   Seller's Obligations at Closing.   Seller shall execute and deliver the following to Purchaser at Closing:

(a)   A Special Warranty Deed ("Deed") from Seller conveying the Real Estate to Purchaser, together with the Seller's right, title and interest in and to the rest of the Property free of all monetary liens of an ascertainable amount;

(b)   "Non-Foreign Affidavit," certifying that Seller is not a "foreign person" as such term is defined in the applicable statutes;

(c)   Possession of the Property;

(d)   ALTA Statement/Owner's Affidavit;

(e)   GAP Undertaking, if applicable;

(f)   Such affidavits or other documents, if any, as are required by the Title Company to satisfy all affirmative coverages deemed necessary by Purchaser and for the elimination of any standard exceptions in an owner's policy of title insurance covering the Property in favor or Purchaser in the amount of the Purchase Price ("Policy"), without any cost or expense to Seller;

(g)   Counterpart signature pages to all applicable transfer tax declarations;

(h)   Counterpart signature to Closing Statement;

(i)    Counterpart signature pages to any Assignment and Assumption Agreements.

(j)    1099; and

(k)    Such other documents as may be necessary or desireable to consummate the purchase and sale contemplated in this Agreement.

SECTION 5    SETTLEMENT AND PRORATIONS.

The following items shall be prorated or settled between Purchaser and Seller at Closing:

5.1    <u>Taxes and Other Items</u>.  Ad valorem property taxes, community association fees, solid waste and governmental fees, and utility bills for which service cannot be terminated as of the date of Closing shall be prorated as of the date of Closing based on 100% of the most recent ascertainable bills therefor.  In the event that Purchaser assumes any unexpired leases pursuant to Section 7 hereof, rents paid or payable under such leases shall be prorated such that Purchaser shall be entitled to all rents attributable to the period following the Closing Date, and Seller shall be entitled to all rents attributable to the period prior to and including the Closing Date.  All prorations are final.

5.2    <u>Closing Costs</u>.  Transfer taxes, if any, shall be allocated and paid by the parties in accordance with applicable law.  Purchaser shall bear all costs related to any mortgage lender's loan policy of title insurance (including related recording charges) and any endorsements to the Policy requested by Purchaser, as well as the Cure Costs as defined in Section 7 hereof.  Purchaser and Seller shall each be responsible for their respective legal, consultant and other professional fees.  Purchaser and Seller shall share equally in the remaining closing costs, including, without limitation, the cost of the Policy, recording charges associated with the conveyance of the Property, title company/escrow fees, etc.

SECTION 6    CONDITION OF PROPERTY; REPRESENTATIONS AND WARRANTIES

6.1    <u>DISCLAIMER AND RELEASE</u>.  SELLER IS SELLING THE PROPERTY WITHOUT REPRESENTATION OR WARRANTY, SHALL HAVE NO OBLIGATION TO MAKE ANY REPAIRS, PAY FOR ANY ENVIRONMENTAL INSPECTIONS OR OTHER REPORTS, OR DO OR PERFORM ANY OTHER WORK ON THE PROPERTY.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN SECTION 6.2 OF THIS AGREEMENT (THE "EXPRESS WARRANTIES"), PURCHASER IS RELYING SOLELY ON ITS OWN INSPECTION AND EXAMINATION IN PURCHASING THE PROPERTY; AND IS PURCHASING THE PROPERTY ON AN "AS-IS, WHERE-IS" BASIS WITH ALL FAULTS AND DEFECTS NOW KNOWN OR HEREAFTER DISCOVERED BY PURCHASER.  EXCEPT FOR THE EXPRESS WARRANTIES, NONE OF SELLER, SELLER'S SHAREHOLDERS, OFFICERS, DIRECTORS, MANAGER(S), MEMBERS, NOR ANY OF ITS AGENTS OR EMPLOYEES MAKE ANY REPRESENTATION OR WARRANTY TO PURCHASER, EXPRESS OR IMPLIED, AS TO (A) THE SUITABILITY OF THE PROPERTY FOR PURCHASER'S INTENDED USE, OR ANY PARTICULAR PURPOSE OR THE MERCHANTABILITY OR FITNESS THEREOF, (B) THE ENVIRONMENTAL CONDITION OF THE PROPERTY (C) THE SUITABILITY

OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, INCLUDING THE POSSIBILITIES FOR FUTURE DEVELOPMENT OF THE PROPERTY; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS CURRENT OR INTENDED OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY (INCLUDING WITHOUT LIMITATION, THE FEDERAL COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT (42 U.S.C SECTION 9601 ET SEQ.) AND OTHER ENVIRONMENTAL LAWS, RULES OR REGULATIONS) AND ANY CLAIMS MADE OR OBLIGATIONS OR LIABILITIES IMPOSED PURSUANT THERETO, AND ANY ZONING ORDINANCES; (E) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY; (F) THE PRESENCE OR ABSENCE OF HAZARDOUS MATERIALS AT, ON, UNDER, OR ADJACENT TO THE REAL ESTATE OR ANY OTHER ENVIRONMENTAL MATTER OR CONDITION OF THE PROPERTY; OR (G) ANY OTHER MATTER WITH RESPECT TO THE CONDITION OF THE PROPERTY; AND, EXCEPT FOR THE EXPRESS WARRANTIES, ALL SUCH REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED BY SELLER, AND PURCHASER HEREBY RELEASES SELLER, SELLER'S SHAREHOLDERS, DIRECTORS, OFFICERS, MANAGER(S), MEMBERS, AGENTS AND EMPLOYEES (COLLECTIVELY THE "SELLER PROTECTED PARTIES") FROM ANY AND ALL RESPONSIBILITY AND LIABILITY IN RESPECT THEREOF. WITHOUT LIMITATION OF THE PROVISIONS ABOVE, PURCHASER HEREBY RELEASES SELLER AND THE OTHER SELLER PROTECTED PARTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, OR LIABILITIES ARISING OUT OF OR RELATING DIRECTLY OR INDIRECTLY TO ANY ENVIRONMENTAL HAZARD AT, IN, ON OR UNDER THE PROPERTY. ANY REPRESENTATIONS, WARRANTIES OR STATEMENTS MADE BY ANY MEMBER, EMPLOYEE, AGENT OR REPRESENTATIVE OF SELLER, INCLUDING WITHOUT LIMITATION THE BROKER DEFINED BELOW, MAY NOT BE RELIED UPON BY PURCHASER AND DO NOT CONSTITUTE A PART OF THIS AGREEMENT. FOR PURPOSES OF THIS PARAGRAPH, THE TERM "ENVIRONMENTAL HAZARD" SHALL MEAN ANY HAZARDOUS MATERIAL, OR THE STORAGE, HANDLING, PRODUCTION, DISPOSAL, TREATMENT OR RELEASE THEREOF; AND THE TERM "HAZARDOUS MATERIAL" SHALL MEAN (A) ANY HAZARDOUS WASTE, ANY EXTREMELY HAZARDOUS WASTE, OR ANY RESTRICTED HAZARDOUS WASTE, OR WORDS OF SIMILAR IMPORT, AS DEFINED IN THE RESOURCE CONSERVATION AND RECOVERY ACT (42 U.S. C. SECTION 6901 ET SEQ.); (B) ANY HAZARDOUS SUBSTANCES AS DEFINED IN THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT (42 U.S. C. SECTION 9601 ET SEQ.); (C) ANY TOXIC SUBSTANCES AS DEFINED IN THE TOXIC SUBSTANCES CONTROL ACT (15 U.S. C. SECTION 2601 ET SEQ.); (D) ANY POLLUTANT AS DEFINED IN THE CLEAN WATER ACT (33 U.S. C. SECTION 1251 ET SEQ.); (E) GASOLINE, PETROLEUM OR OTHER HYDROCARBON PRODUCTS OR BY-PRODUCTS; (F) ASBESTOS; OR (G) ANY OTHER MATERIALS, SUBSTANCES, OR WASTES SUBJECT TO ENVIRONMENTAL REGULATION UNDER ANY APPLICABLE FEDERAL, STATE OR LOCAL LAW, REGULATION, OR ORDINANCE NOW OR HEREAFTER IN EFFECT.

6.2   Seller's Representations and Warranties.  Seller represents and warrants to Purchaser that, except to the extent set forth on any Exhibit attached hereto or any materials or information delivered to or discovered by Purchaser or its agents prior to the Effective Date:

(a)   Organization and Authority.  Seller is a limited liability company duly organized, existing and in good standing under the laws of Illinois.  This Agreement has been duly and validly authorized by Seller, and no other action on the part of Seller is required in connection with this Agreement, and this Agreement shall constitute a valid and binding obligation of Seller that is enforceable against Seller in accordance with the terms of this Agreement.

(b)   Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as defined in the Internal Revenue Code ("Code")), and is not subject to the provisions of Sections 897(a) or 1445 of the Code related to the withholding of sales proceeds to foreign persons.

6.3   Purchaser's Representations and Warranties.  Purchaser represents and warrants to Seller that:

(a)   Purchaser has full capacity, right, power, and authority to execute, deliver and perform this Agreement and all documents to be executed by Purchaser pursuant hereto, and all required actions and approvals therefor have been duly taken and obtained. The individuals signing this Agreement and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.  This Agreement and all documents to be execute pursuant hereto by Purchaser are and shall be binding upon and enforceable against Purchaser in accordance with their respective terms. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will (A) result in a breach of or a default under any agreement to which Purchaser is a party or by which Purchaser is bound, or (B) violate any restriction, court order or agreement to which Purchaser is subject.

(b)   Purchaser shall be fully responsible for the payment and satisfaction of any and all obligations, liabilities, expenses and accruals relating to or affecting the Property which are incurred or accrued or where the underlying act or omission giving rise to any claim or cause of action occurs on or after the Closing Date.

Each covenant, agreement, representation and warranty of Purchaser contained in this Agreement shall survive the Closing or termination of this Agreement.

SECTION 7   EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

Exhibit B attached hereto and incorporated herein sets forth a list of third party contracts and unexpired leases affecting the Property that Purchaser wishes to either (a) assume at Closing ("Assumed Contracts"), or (b) have Seller terminate prior Closing ("Rejected Contracts"). Provided that, prior to Closing the Bankruptcy Court approves of the assumption of the Assumed Contracts by Purchaser and the rejection of the Rejected Contracts, at Closing, (i) Seller shall

assign, and Purchaser shall assume, the Assumed Contracts pursuant to assignment and assumption agreements in form acceptable to Seller and the Bankruptcy Court (collectively, the "Assignment and Assumption Agreements"), and (ii) Seller shall terminate the Rejected Contracts. Any third party contracts and/or unexpired leases affecting the Property that are not identified on Exhibit B shall be deemed to be Rejected Contracts. Purchaser shall be responsible for payment of any cure payment, adequate protection payment, or other amounts (collectively, the "Cure Costs") that must be paid to a counterparty to all Assumed Contracts pursuant to the Bankruptcy Code. For the avoidance of doubt, any Cure Costs shall be in addition to the Purchase Price.

SECTION 8   CONDEMNATION.

If, between the Effective Date of this Agreement and Closing, all or any material portion of the Property is taken in condemnation or a written notice ("Condemnation Notice") from a governmental authority is received by Seller indicating its intention to take all or a portion of the Property, in condemnation, Seller shall give written notice thereof to Purchaser, and Purchaser shall have the option to terminate this Agreement by delivering written notice thereof to Seller within ten (10) days following such delivery. If Purchaser exercises its option to terminate in accordance with this Section 8, Seller shall cause the return the Earnest Money and any interest thereon to Purchaser, and neither party shall have any further obligation hereunder except as set otherwise expressly set forth herein. If Purchaser does not so exercise its option to terminate as provided in this Section 8, or if a non-material portion of the Property is subject to a condemnation proceeding, then this Agreement shall continue in full force and effect and title shall be subject thereto. In such event, the Purchase Price shall be paid by Purchaser at Closing without reduction, but Seller shall remit to Purchaser all awards received by Seller as a result of the condemnation. If Purchaser does not timely exercise its right of termination in accordance with the terms of this Section 8, then Purchaser shall be deemed to have waived such right. For purposes of this Section 8, a "material portion of the Property" shall mean twenty-five percent (25%) of the Property.

SECTION 9   DEFAULT AND REMEDIES.

(a)   Default.

(i)   In the event that either party hereto shall fail to perform any obligation or covenant of such party imposed hereby, or in the event that any representation or warranty of either party made hereunder shall be determined by the other party to be materially false, then such party shall be deemed in default hereunder. Seller and Purchaser agree that in the event of a default by either party, the other party shall, prior to taking any such action as may be available to it, provide written notice to the defaulting party stating the default and giving the defaulting party ten (10) days to cure.

(ii)   If a default by Purchaser shall not be cured within the timeframe provided above, then Seller, as its sole and exclusive remedy for Purchaser's default in any of Purchaser's obligations under this Agreement, shall be limited to the termination of this Agreement and the forfeiture by Purchaser to Seller of the Bid Deposit as and for Seller's liquidated damages in lieu of any and all other remedies, it being agreed that damages to Seller in the event of such Purchaser default are difficult or impossible to ascertain in advance and that the Bid Deposit and interest earned thereon represents a reasonable approximation of such damages.

(iii)   If a default by Seller shall not be cured within the timeframe provided above, then Purchaser, as its sole and exclusive remedy for Seller's default in any of Seller's obligations under this Agreement, may elect to (A) terminate this Agreement and receive a return of the Bid Deposit; or (B) waive such default and purchase the Property subject to such default on the terms herein.

(b)   Reports and Materials.  In the event of termination as provided above, Purchaser shall promptly deliver to Seller all documentation provided by Seller to Purchaser regarding the Property (including all copies and originals), as well as originals and copies of any and all reports, studies, tests or other documentation prepared or obtained by Purchaser in connection with Purchaser's due diligence review of the Property, at no cost to Seller.

SECTION 10  BROKERS.

Purchaser and Seller hereby warrant and covenant to the other party that it has not dealt with any real estate broker or salesperson in connection with this sale of the Property except James Angelotti of CBRE, Inc. (the "Broker"), and that no other real estate commissions, finders' fees or brokers' fees have been or will be incurred in connection with this Agreement or the sale contemplated hereby except a commission to be paid by Seller to Broker at Closing in accordance with the terms of a separate commission agreement with the Broker.  Purchaser hereby agrees to defend, indemnify and hold harmless Seller, from and against any claims by other third parties for brokerage commissions, finder's fees, or other fees relative to this Agreement or the sale of the Property, and any court costs, attorneys' fees or other costs or expenses arising therefrom and alleged to be due by authorization of the Purchaser. The obligations of this Section 10 shall survive Closing.

SECTION 11  ASSIGNMENT

This Agreement may be assigned by Purchaser without the prior written consent of Seller to effectuate a 1031 exchange with purchase of the Property hereunder, upon no less than three (3) business days' advance written notice to Seller; provided, however, (i) the Closing shall not be delayed or affected by reason of the 1031 exchange, nor shall the consummation or the accomplishment of the 1031 exchange be a condition precedent or condition subsequent to such party's obligations under this Agreement, (ii) in the case of a 1031 exchange, Purchaser shall affect the 1031 exchange through a qualified intermediary and Seller shall not be required to exchange property or be required to acquire or hold title to any real estate other than the Property for purposes of consummating the 1031 exchange; (iii) Seller shall not be required to incur any liability or expense in connection with the 1031 exchange; and (iv) Purchaser shall pay any additional costs and fees that would not otherwise have been incurred by Seller, had the Purchaser not consummated this transaction sale through the 1031 exchange. Seller shall not, by this Agreement, or acquiescence to the 1031 exchange: (i) have its rights under this Agreement affected or diminished in any manner; or (ii) be responsible for compliance with or be deemed to have warranted to Purchaser that the 1031 exchange, in fact, complies with Section 1031 of the Internal Revenue Code of 1986, as amended.

This Agreement may not be assigned by Purchaser without the prior written consent of Seller, which consent shall not be unreasonably withheld. Any permitted assignment of this Agreement by Purchaser shall not lessen, discharge or release the Purchaser named herein of its obligations hereunder.


SECTION 12  MISCELLANEOUS.

12.1   Notices. Any notice, request, demand, instruction or other document to be given or served hereunder or under any document or instrument executed pursuant hereto shall be in writing and shall be delivered personally with a receipt requested therefor or sent by a recognized overnight courier service or by United States registered or certified mail, return receipt requested, postage prepaid and addressed to the parties at their respective addresses set forth below, and the same shall be effective (a) upon receipt or refusal if delivered personally; (b) one (1) business day after depositing with such an overnight courier service or (c) two (2) business days after deposit in the mails if mailed.  A party may change its address for receipt of notices by service of a notice of such change in accordance herewith.

If intended for Seller, to:

Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
Attn:  Richard S. Lauter

If intended for Purchaser, to:

_____

_____

_____

_____

12.2    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, personal representatives, successors and permitted assigns.

12.3    Entire Agreement. This Agreement, together with the exhibits attached hereto, constitutes the entire agreement between Seller and Purchaser, and may not be modified in any manner except by an instrument in writing signed by both parties.

12.4    Headings. The section and subsection headings contained in this Agreement are inserted only for convenient reference and do not define, limit or proscribe the scope of this Agreement or any Exhibit attached hereto.

12.5    Counterparts. This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument. Facsimile and PDF signatures hereon shall be as valid and binding as original signatures.

12.6    Unenforceable Provisions. If any provision of this Agreement, or the application thereof to any person or situation shall be held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to persons or situations other than those to which it shall have been held invalid or unenforceable, shall continue to be valid and enforceable to the fullest extent permitted by law.

12.7    Time of the Essence. Time is strictly of the essence with respect to each and every term, condition, obligation and provision of this Agreement, and the failure to timely perform any of the terms, conditions, obligations or provisions hereunder by either party shall constitute a breach of and a default under this Agreement by the party so failing to perform. In calculating any period of time provided for in this Agreement (a) the day of the act or event from which the designated period of time begins to run will not be included the number of days allowed, and (b) the number of days shall refer to calendar and not business days, unless expressly stated otherwise herein. If any day scheduled for performance of any obligation hereunder shall occur on a weekend or legal holiday, the time period allowed and day for performance shall be continued to the next business day.

12.8    Governing Law; Construction of Agreement. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. Seller and Purchaser and their respective counsel have reviewed, revised and approved this Agreement. Accordingly, the normal rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

12.9    Knowledge. There shall be no liability on the part of Seller, whether prior to or after Closing, for breaches of any of its representations, warranties or covenants if Purchaser had actual knowledge thereof prior to Closing.

12.10    Non-Imputation. By virtue of this Agreement, neither party, in any way or for any purpose shall become or be deemed a partner of the other in the conduct of its business or

otherwise, or become or be deemed joint venturer or a member of a joint enterprise with the other.

12.11    No Recordation.    Purchaser shall not, without the express written consent of Seller, record or file this Agreement or a memorandum hereof with the recorder of deeds of the county in which the Property is located.

12.12    Recitals and Exhibits. Any recitals set forth in this Agreement and the Exhibits attached hereto are hereby incorporated herein by this reference as part of this Agreement.

12.13    Amendments.    No modification, amendment, discharge or change as to this Agreement shall be valid unless the same is in writing and is executed by Seller and Purchaser.

12.14    Waiver.    No waiver or any breach or any covenant or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision herein contained.

12.15    Third Party Benefits.    Other than as expressly set forth in this Agreement, the parties hereto do not intend to confer any benefit hereunder to any person, firm, corporation or other entity other than the parties hereto.

[Signature Page to Follow]

This Agreement has been executed as of the date first appearing above.

**SELLER:**                                    **PURCHASER:**

OHCMC - Oswego, LLC an Illinois limited        _____,
liability company                              a(n) _____

                                               By:_____
By:_____                   Name: _____
Name: _____                   Its:_____
Its:_____

EXHIBIT A

LEGAL DESCRIPTION

BARDEN FARM:

THE NORTHWEST 1/4 AND THE NORTH 1/2 OF THE SOUTHWEST 1/4 OF SECTION 22, TOWNSHIP 37 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN TOWNSHIP OF OSWEGO, KENDALL COUNTY, ILLINOIS.

PIN:  03-22-100-001 (240 acres)

DAVIS FARM:

PARCEL ONE:  THAT PART OF THE SOUTHEAST 1/4 OF SECTION 21, TOWNSHIP 37 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, BOUNDED AND DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF SAID SECTION 21; THENCE SOUTH 89 DEGREES 29 MINUTES 48 SECONDS WEST, ALONG THE SOUTH LINE OF SAID SECTION 21, 1490.70 FEET, TO THE SOUTHEAST CORNER OF ASHCROFT PLACE, BEING A SUBDIVISION, PER DOCUMENT 200400019250, RECORDED JULY 4TH, 2004; THENCE NORTH 01 DEGREES 13 MINUTES 12 SECONDS WEST, ALONG THE EAST LINE AND THE EAST LINE EXTENDED OF SAID SUBDIVISION, 2644.93 FEET, TO THE NORTH LINE OF SAID SOUTHEAST 1/4; THENCE NORTH 89 DEGREES 24 MINUTES 49 SECONDS EAST, ALONG SAID NORTH LINE, 1488.84 FEET, TO THE EAST LINE OF SAID SECTION 21; THENCE SOUTH 01 DEGREES 19 MINUTES 28 SECONDS EAST, ALONG SAID EAST LINE, 2647.15 FEET, TO THE POINT OF BEGINNING, IN KENDALL COUNTY, ILLINOIS.

PIN:  PIN 03-21-400-00 (190.83 acres)

PARCEL TWO:
THE EAST 20 ACRES NORTHEAST 1/4 OF SECTION 21, TOWNSHIP 37 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN OSWEGO TOWNSHIP, KENDALL COUNTY, ILLINOIS.

PIN:  03-21-200-003 (20 acres)

PARCEL THREE:

THE NORTHEAST QUARTER OF SECTION 21, EXCEPTING THE EAST 20 ACRES THEREOF AND ALSO EXCEPTING THAT PART OF SAID NORTHEAST 1/4 LYING WITHIN THE FOLLOWING DESCRIBED PROPERTY: BEGINNING AT THE CENTER OF SAID SECTION 21; THENCE SOUTH 89 DEGREES 36 MINUTES 36.1 SECONDS EAST ALONG THE SOUTH LINE OF THE NORTH 1/2 OF SAID SECTION 21, 5.66 FEET TO AN OLD FENCE LINE RUNNING IN A NORTHERLY DIRECTION; THENCE NORTH 0 DEGREES 36 MINUTES 16.6 SECONDS WEST ALONG SAID FENCE, 556.09 FEET; THENCE NORTH 89 DEGREES 36 MINUTES 36.1 SECONDS WEST PARALLEL WITH

SAID SOUTH LINE, 235.00 FEET; THENCE SOUTH 0 DEGREES 36 MINUTES 16.1 SECONDS EAST PARALLEL WITH SAID OLD FENCE LINE, 556.09 FEET TO SAID SOUTH LINE; THENCE SOUTH 89 DEGREES 36 MINUTES 36.1 SECONDS EAST ALONG SAID SOUTH LINE, 229.34 FEET TO THE POINT OF BEGINNING), TOWNSHIP 37 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN KENDALL COUNTY, ILLINOIS;

AND ALSO EXCEPTING THEREFROM THAT PART OF THE LAND CONVEYED TO THE OSWEGO FIRE PROTECTION DISTRICT BY DEED RECORDED AS DOCUMENT 2008000015089 DESCRIBED AS FOLLOWS:
THAT PART OF THE NORTHEAST 1/4 OF SECTION 21, TOWNSHIP 37 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN COMMENCING AT THE CENTER OF SAID SECTION 21; THENCE SOUTH 89 DEGREES 36 MINUTES 36.1 SECONDS EAST ALONG THE SOUTH LINE OF THE NORTHEAST 1/4 OF SAID SECTION 21, 5.66 FEET TO AN OLD FENCE LINE RUNNING IN A NORTHERLY DIRECTION FOR THE POINT OF BEGINNING THENCE NORTH 00 DEGREES 36 MINUTES 16.6 SECONDS WEST ALONG SAID FENCE, 556.09 FEET; THENCE SOUTH 89 DEGREES 36 MINUTES 36.1 SECONDS EAST PARALLEL WITH SAID SOUTH LINE, 156.69 FEET; THENCE SOUTH 00 DEGREES 36 MINUTES 16.6 SECONDS EAST PARALLEL WITH SAID OLD FENCE LINE, 556.09 FEET TO SAID SOUTH LINE; THENCE NORTH 89 DEGREES 36 MINUTES 36.1 SECONDS WEST ALONG SAID SOUTH LINE. 156.69 FEET TO THE POINT OF BEGINNING.

PIN: 03-21-200-004 (135.70 acres)

## EXHIBIT B

### ASSUMED CONTRACTS AND REJECTED CONTRACTS

Assumed Contracts:

Rejected Contracts: